ANDREW DUNCAN, PLAINTIFF IN ERROR, *v.* ISAAC DARST, HENRY DARST, AND JACOB DARST, DEFENDANTS.

A person in custody under a *capias ad satisfaciendum* issued under the authority of the Circuit Court of the United States, cannot legally be discharged from imprisonment by a state officer, acting under a state insolvent law.

THIS case came up by writ of error from the Circuit Court of the United States for the eastern district of Pennsylvania.

The facts in the case were not disputed, and were as follow:

Isaac Darst; Henry Darst, and Jacob Darst, citizens of the state of Ohio, recovered a judgment in the Circuit Court of Pennsylvania, against one Jacob Roth, who was arrested on a *capias ad satisfaciendum*, and handed over for safe-keeping to Andrew Duncan, sheriff of the county of York. This was on the 6th of December, 1832. On the next day, Roth applied to George Barnitz, an associate judge of the Court of Common Pleas for the county of York, for the benefit of an act of the legislature of Pennsylvania, passed on the 28th of March, 1820, entitled, "A supplement to the act entitled A supplement to the act entitled An act for the relief of insolvent debtors, passed the twenty-ninth of January, one thousand eight hundred and twenty."

The first section of the act referred to is as follows:

"That if any debtor shall hereafter be arrested or held in execution, on a bail piece, in a civil suit, and who shall have resided six months in this commonwealth previously thereto, he may apply, when arrested on execution, to the president or any associate judge of the Court of Common Pleas of the county in which he is so arrested, or when held on a bail piece, may apply to the president or associate judge of the said court, in the county in which the suit was instituted, and give bond to the plaintiff or plaintiffs, at whose suit he is so arrested and held, with such security as shall be required and approved of by the said judge: the condition of which bond shall be, that the said debtor shall be and appear at the next Court of Common Pleas for said county, and there take the benefit of the insolvent laws of this commonwealth, and to surrender himself to the jail of the said county, if he fail to comply with all things required by law to

2 C

entitle him to be discharged, and generally to abide all orders of the said court: whereupon the said judge shall give an order to the sheriff, constable, or other person, having such debtor in custody, to forthwith discharge him upon his paying the jail fees, if any be due.''

It was admitted that this act was in force on the 7th of December, 1832, and for a long time afterwards; that Roth had resided in the commonwealth of Pennsylvania for six months previously to his application, and that he complied, in all respects, with the provisions of the above section. The judge gave an order to the sheriff having Roth in custody, to forthwith discharge him upon his paying the jail fees, and he was thereupon discharged.

Darst brought an action against Duncan for an escape, who pleaded specially the above matters in his defence. The plaintiff demurred to the plea, and the demurrer was sustained in the Circuit Court; and, upon the validity of this demurrer, the case was brought up to this court.

The statute of Pennsylvania, above recited, required the party who desired to be discharged from imprisonment, to give bond that he would appear at the next Court of Common Pleas, and there take the benefit of the insolvent laws of the commonwealth. Upon a reference to the acts then existing, it will be found that the privileges conferred upon the debtor and the duties required of him, by the insolvent laws, are the following: He was to be declared free from imprisonment, not only upon that suit, but from subsequent arrests, on his giving a warrant to appear in court; and although the property which he might subsequently acquire was subject to execution, yet the court was at liberty to exempt it, provided two-thirds of his creditors assented. The duties required of the debtor were, that he should hand in a list of his property, creditors, debts, and losses; that he should not be guilty of collusion or false swearing; that he should not conceal or convey away his property, under penalty of imprisonment; and that he should be liable to punishment at hard labour, if found to be a fraudulent debtor. The property of and debts due to the debtor were vested in trustees, who were to convert them into cash and divide it among the creditors; the surplus, if any, belonging to the debtor.

This is the process through which it was necessary to pass, according to the bond of any one who might be discharged from imprisonment, as Roth was.

*Read,* for the plaintiff in error.
*Penrose,* for defendant.

*Read,* for plaintiff, took the following positions:

1. The third section of the process act of the 19th May, 1828, expressly adopted the act of Assembly of Pennsylvania of the 28th March, 1820, and particularly the first section thereof, as a part of the proceedings on writs of execution, issued out of the courts of the United States, sitting within the state of Pennsylvania, and the discharge therefore of the said Jacob Roth, in pursuance thereof, was a lawful one, and obligatory both upon the said sheriff of York and the plaintiff in the execution.

2. That the said defendant, a state officer, in thus obeying the legal order of a state judge under a state law, adopted by the express words of an act of Congress, was not guilty of an escape.

3. That under the circumstances appearing on the record, no action of debt for an escape would lie against the plaintiff in error.

To sustain these positions, he referred to Wayman *v.* Southard, 10 Wheat. 1; United States Bank *v.* Halstead, 10 Wheat. 51; Beers *v.* Haughton, 9 Peters, 329; Ross *v.* Duval, 13 Peters, 45; Amis *v.* Smith, 16 Peters, 303; Bronson *v.* Kinzie, decided at the present term.   In 9 Peters, 362, all the laws regulating state officers were adopted, and the reason is found in 12 Wheat. 283.

In 1789, the United States applied to the states for the use of their jails, 1 Story, 70, 207; and Pennsylvania complied. 2 Smith's Laws of Pa. 513.   (Mr. Read referred to and commented upon the several acts of Congress respecting writs and processes, and traced the history of laws relaxing imprisonment for debt.)

*Penrose,* for defendants, entered into a critical examination of the powers of the federal government and states, and contended, that whether the act of Congress of 1828 adopted state insolvent laws or not, it did not intend that they should be enforced by state officers, to the exclusion of the jurisdiction of the United States courts. He then reviewed the cases cited on the other side, and maintained that they did not authorize the positions assumed.

*Read,* in reply :

The argument made on the other side takes the same ground as the dissenting opinion of Mr. Justice Thompson, in the case of Ogden *v.* Saunders. But the court did not so think. In 1819, Pennsylvania passed a law exempting females from imprisonment for debt, which was not enacted by Congress until 1838. In the mean time, they would have been subject to this process from the federal court, if the argument on the other side be correct. In 1828, it was declared that the United States courts should have the same rules as state courts. Suppose a man imprisoned under process from both courts; could he come out, under the insolvent law, from one and not the other? If so, how have they both the same rules?

Mr. Justice CATRON delivered the opinion of the court.

It appears from the record that in 1824 Darst and others recovered, in the Circuit Court of the United States for the eastern district of Pennsylvania, a judgment against Jacob Roth, for the sum of $5465.

In November, 1832, a *capias ad satisfaciendum* was sued out against him, returnable to the April term, 1833, of the court. On the 6th of December, 1832, the marshal arrested Roth, and delivered him to Duncan, the sheriff and jailer of York county, for safe-keeping in the jail of that county, until discharged by due course of law. On the 7th of December, Duncan discharged him from custody, and the present suit was brought for an escape.

He pleaded in justification, that Roth applied to G. B., an associate judge of the Court of Common Pleas of York county, gave bond and security to appear at the next Court of Common Pleas, then and there to take the benefit of the insolvent laws of Pennsylvania; and to surrender himself to the jail of the county, if he failed to comply with all things required by law, to entitle him to be discharged, &c. To this plea there was a demurrer, and judgment for the plaintiffs.

To the regularity of the writ of *capias ad satisfaciendum;* to its execution on the body of Roth; or to his delivery to Duncan as the proper jailer to receive him, there is no objection made: the case turns exclusively on the question, whether by giving

Duncan *v.* Darst et al.

bond and security to appear in the insolvent court, the sheriff was authorized to release Roth from imprisonment.

It is admitted that had Roth been arrested by a sheriff on a *ca. sa.*, issued from a state court of Pennsylvania, a discharge would have been proper on his giving the bond: and it is contended the same consequence followed in this case, because the acts of Congress had adopted the modes of proceeding on final process, governing the state courts and officers.

This brings up the question, to what extent Congress had adopted the various causes of discharge, (in 1832,) provided by the state laws, for the release of debtors, imprisoned by virtue of writs of *ca. sa.* issued by courts of the United States: beyond the state laws adopted, it is settled the federal courts are not bound to conform to state regulations. What state laws apply, and regulate the modes of proceeding in the courts of the United States, depends on a proper understanding of the acts of Congress, on the subject.

The first in order, is that of 1789, c. 21, s. 2; which declares, the forms of writs and executions, and the modes of process in suits at common law, shall be the same in each state respectively as are now used, or allowed in the Supreme Courts of the same. This act was temporary, but is referred to, and in part sanctioned, by that of 1792, c. 36, s. 2. This declares: That the forms and modes of proceeding, in suits at common law, shall be the same as are now used in the courts of the United States respectively, in pursuance of the act of 1789, c. 21.

By the first section of the act of 1828, c. 68, the then processes and modes of proceeding of the highest state court of original jurisdiction, are prescribed as applicable to the courts of the United States in the states respectively that came into the Union, after 1789.

But the third section applies to the old and new states equally, except Louisiana; and declares:—" That writs of execution, and other final process, issued on judgments and decrees, and the proceedings thereupon, shall be the same in each state, respectively, as are now used in the courts of such state." Giving the courts power to alter final process by rules so far only, as to conform to any state law subsequently passed, on the subject. No rules have been adopted in Pennsylvania, and the acts of Congress referred to therefore govern this case.

VOL. I.—39                    2 c 2

The terms, "modes of process," in the act of 1789; and, "proceedings upon executions, and other final process,". in the act of 1828, have the same meaning, and include all the regulations and steps incident to that process, from its commencement to its termination as prescribed by the state laws; so far as they can be made to apply to the federal courts: as this court held in Wayman *v.* Southard, 10 Wheat. 27, 28, and also, in Beers *v.* Houghton, 9 Peters; United States *v.* Knight, 14 Peters; Amis *v.* Smith, 16 Peters, 312.

Congress however did not intend to defeat the execution of judgments rendered in the courts of the United States; but meant they should have full effect by force of the state laws adopted: and therefore all state laws regulating proceedings, affecting insolvent persons; or that are addressed to state courts, or magistrates in other respects; which confer peculiar powers on such courts and magistrates, do not bind the federal courts, because they have no power to execute such laws. The case of Palmer *v.* Allen, 7 Cranch, 563, is to this effect. Palmer as deputy marshal arrested Allen on a *capias ad respondendum,* in the district of Connecticut, and imprisoned him. By the laws of that state, this could not be done, without a mittimus from a magistrate. This court held the process acts did not adopt the law of Connecticut, which required the mittimus: "That it was a peculiar municipal regulation, not having any immediate relation to the progress of the suit, and only imposing a restraint on the state officers; but altogether inoperative upon those of the United States." Had it been necessary to ask the aid of the magistrate, to execute the process; then he would have had the discretion to refuse, and thereby to defeat it.

As state courts, or magistrates, cannot be compelled to aid a federal court in the exercise of its jurisdiction; so neither can they be permitted to restrain its process by injunction, or otherwise, as was held in McKim *v.* Voorhies, 7 Cranch. It follows, that a state law, regulating the practice of state courts, and addressed to its judges and magistrates; but which can only be executed by them, or with their aid, is a peculiar municipal regulation; not adopted by the acts of Congress, nor applicable to the courts of the United States.

The case of Duncan must be tested by these rules. Roth ap-

plied to a judge of the Common Pleas, and gave a bond, to appear at that court, at its next term, and take the benefit of the insolvent laws. On this single step being taken, the jailer discharged him. The proceeding had no reference to the process by which Roth was imprisoned; but to a new proceeding, proposed to be instituted, by which all his property should be equally distributed among all his creditors; and his person be exempted in future from arrest for his existing debts when discharged.

As all the creditors of Roth had the right to become parties to the proceeding in the insolvent court, no matter where they resided, it is manifest the Circuit Court of the United States could take no jurisdiction of the parties, nor execute the insolvent law, had an application been made to that court for such purpose. It is therefore a peculiar law, as respects the court of the United States; is strictly municipal in its character: and as it could only be executed by the state courts, no action under it, by these courts, could affect the process by which Roth was imprisoned.

This opinion is, in conformity to the decision of the Supreme Court of Pennsylvania, in the case of Duncan *v.* Klinefetter, 5 Watts's Rep. 141. That was an action on the case, by the present plaintiff in error, Duncan, against the jailer his deputy, for discharging Roth; whereby, Duncan alleged he had sustained damage.

It is insisted the foregoing conclusion is in conflict with the decision of this court in the case of Beers *v.* Haughton, 9 Peters; and which decision is confidently relied on as governing this case. In that case, Beers sued Harris, in the Circuit Court of Ohio; Haughton became bail for Harris. Judgment was recovered in December, 1830; a *ca. sa.* was run against Harris, and returned not found.

In February, 1832, Harris took the benefit of the insolvent law of Ohio: by this proceeding his person was exempted from arrest in all cases, for debts previously contracted.

In December, 1832, Beers sued Haughton on the bail bond; who pleaded and relied on the discharge of Harris.

By the laws of Ohio, the bail has the right to surrender the principal at any time before he is thus sued, and served with the process.

Haughton undertook that Harris should surrender his person, if he failed to pay the debt. To enforce this condition, the *ca. sa.* issued. The bail had the right to arrest the principal, and deliver

him to the marshal, who could imprison the debtor as if arrested by the *ca. sa.* Not being subject to imprisonment after the discharge under the insolvent law, the marshal could not receive the prisoner; nor could he have lawfully arrested him. It followed, the bail was equally inhibited; and of course discharged from performance, by the act of the law; just as certainly as he would have been discharged by the act of God, had Harris died, at the time he was released under the insolvent act. This is the doctrine settled in Beers *v.* Haughton.

Had Roth been discharged in the insolvent court, by its judgment, from future imprisonment, before the *ca. sa.* was executed by the marshal; then a case would have arisen, to which the principle declared in that of Beers *v.* Haughton would apply; as the state of Pennsylvania had the undoubted right to exempt persons thus discharged from imprisonment for debt: so she might exempt all persons whatever. But it does not follow, that one not excepted from the operation of the general law, who had been properly arrested, and imprisoned by the process of a federal court, could be discharged by a state judge. The general rule is,—10 Co. 76, b, same cases cited in note, 5 Watts's R. 144,—(and nothing is better settled,) that an officer is not justified in obeying the order of a judge, or court, having no jurisdiction in the matter; and this rule applies in an especial manner, as between the state and federal courts; where it never has been supposed, that the judges of the one, could control the process of the other. If it was otherwise, and writs of injunction, of *supersedeas*, and orders to discharge defendants from imprisonment, could be granted by state courts, or judges, to render ineffectual process issued from the courts of the United States, the jurisdiction of the latter might be, and probably would be, overthrown in parts of the Union; as it would be the exercise of the power of PROHIBITION; and might be extended to defeat the fruits of all judgments rendered by federal courts, at the discretion of state courts and judges. A conflict of jurisdiction, fraught with more dangerous consequences, could not well be supposed: and to concede the validity of the discharge of Roth, would involve such a consequence, however innocently meant by the state judge; of whose integrity of intention, we have no doubt.

If, during Roth's confinement in prison, he had been declared

Duncan v. Darst et al.

insolvent, by the Court of Common Pleas of York county; then it might have been a question properly made before the Circuit Court of the United States, whether he should be discharged from imprisonment. But as such a motion would have called into exercise the legal discretion of the court upon a mixed question of law and fact; it can be affirmed with something like safety, that the merely giving a bond to appear before the insolvent court, would not have been sufficient to authorize his release from imprisonment. Be this as it may, that court alone had jurisdiction to act in the matter.

It is insisted for the defendant in error, that the act of Congress of 1800, c. 4, for the relief of persons imprisoned for debt, is the only law by which a discharge can be had, from a ca. sa., awarded by a court of the United States. We do not think so. By that law, the district judges are authorized by themselves, or through commissioners appointed for the purpose, to discharge the debtor: he must show, and swear, that he is not worth thirty dollars; and give notice to the execution creditor, before a discharge can be ordered. The debtor may have, and usually has, outstanding claims to choses in action, and interests in property of various kinds; perhaps contingent, and remote; probably of little value, or it might turn out they are of much value: and as he has to swear, that he has no estate real or personal, in possession, reversion, or remainder, to the amount or value of thirty dollars, it will often happen the oath cannot be taken, by the most honest and conscientious debtor. The consequence is, he must remain in prison until the humanity of the creditor interposes: and as he usually resides at a distance, cases of the greatest hardship and distress may occur, if the state laws afford no additional remedy. Whereas, by the laws of some of the states, he may give bond and security, when the process issues from a state court, to the sheriff, to appear at the return term of the writ, and give in a schedule of his property; the title and possession of which are conferred on the sheriff for the benefit of the execution creditor; and the proceeds are applied to the satisfaction of the judgment: and then the debtor is permitted to take the insolvent oath, and be discharged.

As the marshals and courts of the United States, are necessarily governed by the same rules that the sheriffs and courts of the

respective states are, in this respect, they must proceed in the same manner.

So there are other modes of discharge prescribed by the state laws, that can be executed just as conveniently and properly, by the federal courts and judges, as they can be by the state courts or judges, in cases where the execution issues from the latter courts. State laws of this description have been adopted by the acts of Congress, as incident to the remedy: they are cumulative, and in addition to the act of Congress of 1800; both being in force.

As we have adopted in effect the same construction, where property had been levied on, in Amis v. Smith, 16 Peters, 312, it would be harsh to hold otherwise, in restraint of personal liberty.

In that case, a forthcoming bond, for property levied on, had been taken by the marshal, and the property been released according to the laws of Mississippi; the statute of that state, authorizing such a bond and the release of the property. This mode of proceeding was held to be incident to the process of execution, because it had been adopted by the act of Congress of 1828: previously, no delivery bond could have been taken, nor the property released by the marshal.

If bond and security could be taken for the delivery of property seized; the same could not be refused, for the appearance at court of the defendant; conditioned that he give in a schedule of his property, and take the benefit of the insolvent laws; when the statutes of the state where the proceeding was had, expressly commanded it to be done in like cases, under process issued from the state courts, directed to their officers.

We think the judgment of the Circuit Court upon the demurrer was correct, and order it to be affirmed.

### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the eastern district of Pennsylvania, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be and the same is hereby affirmed, with costs and damages at the rate of 6 per centum per annum.